# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | § § | Case No. 20-11002 |
| CHESTER J. MARINE LLC, | § § | Section: "A" |
| Debtor | § § § | Chapter 11 |

| | | |
|---|---|---|
| RUSSELL MARINE TOWING LLC, | § § § | |
| Plaintiff, | § § | |
| v. | § § § | Adversary No. 20-1042 |
| CHESTER J. MARINE LLC, M/V CECILE A. FITCH | § § § | |
| Defendant. | § § | |

| | | |
|---|---|---|
| CHESTER J. MARINE, LLC, | § § § | |
| Plaintiff, | § § | |
| v. | § § § | Adversary No. 20-1048 |
| RUSSELL MARINE TOWING, LLC | § § § | |
| Defendant. | § § | |

1

## **MEMORANDUM OPINION AND ORDER**

This Court conducted a one-day trial on April 7, 2021, to resolve several consolidated matters:[1]

(i) the *Verified Complaint* filed by Russell Marine Towing, LLC in May 2020 in the United States District Court for the Eastern District of Louisiana (the "District Court") and referred to this Court on June 23, 2020, [Adv. No. 20-1042, ECF Doc. 1], and the *Answer and Counterclaim(s)* field by Chester J. Marine, LLC, [Adv. No. 20-1042, ECF Doc. 5];

(ii) the *Petition for Breach of Contract and Damages*, filed by Chester J. Marine, LLC in April 2020 in the 32nd Judicial District Court of the Parish of Terrebonne, State of Louisiana, removed to the District Court and then referred to this Court by the District Court, [Adv. No. 20-1048, ECF Doc. 1], and the *Answer and Affirmative Defenses* filed by Russell Marine Towing LLC, [Adv. No. 20-1048, ECF Doc. 3]; and

(iii) Proof of Claim No. 2 filed by Russell Marine Towing, LLC, against the bankruptcy estate of Chester J. Marine, LLC, and the Objection to Proof of Claim No. 2 filed by Chester J. Marine, [No. 20-11002, ECF Doc. 75].

At the trial, the Court heard testimony from Larry Fitch, Ranny Fitch, Jr., Ed Canton, Jr., and Jack Marie on behalf of Chester J. Marine, LLC, and Russell Lawtum and Loey Lawtum on behalf of Russell Marine Towing, LLC. The Court admitted into evidence the following exhibits: Chester Exhibits 1–14, 20 & 21 and Russell Exhibits A, C–F, H & J–U . At the close of the trial, the Court took the matters under submission. The Court now makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable to these proceedings by Rule 7052 of the Federal Rules of Bankruptcy Procedure.[2]

---

[1] See this Court's Order of October 6, 2020, consolidating the two adversary proceedings, and its Order of December 16, 2020, consolidating the contested matter initiated by Chester J. Marine, LLC's claim objection with the consolidated adversary proceedings. [No. 20-11002, ECF Docs. 72 & 90].

[2] These findings of fact and conclusions of law constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent that any of the following findings of fact are determined to be conclusions of law, they are adopted and shall be construed and deemed conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted and shall be construed and deemed as findings of fact.

2

## JURISDICTION AND VENUE

Federal district courts enjoy "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). But "[e]ach district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 . . . be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a).

Those "cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11" are proceedings that a bankruptcy judge may hear and decide on a final basis, subject to appellate review by the district court. 28 U.S.C. § 157(b); *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 671 (2015). Section 157 provides a nonexclusive list of matters considered to be "[c]ore proceedings." 28 U.S.C. § 157(b)(2); *see also Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir. 1987) ("[T]he phrases 'arising under' and 'arising in' are helpful indicators of the meaning of core proceedings. If the proceeding involves a right created by the federal bankruptcy law, it is a core proceeding; for example, an action by the trustee to avoid a preference. If the proceeding is one that would arise only in bankruptcy, it is also a core proceeding; for example, the filing of a proof of claim or an objection to the discharge of a particular debt.").

But a matter is considered to be "non-core" if it is merely "related to" a case under title 11. *See* 28 U.S.C. § 157(c)(1). "[B]ankruptcy courts [possess] more limited authority in non-core proceedings: They may 'hear and determine' such proceedings, and 'enter appropriate orders and judgments,' only 'with the consent of all parties to the proceeding.'" *Wellness Int'l Network, Ltd.*, 575 U.S. at 671 (quoting 28 U.S.C. § 157(c)(2)). "Absent consent, bankruptcy courts in non-core

3

proceedings may only 'submit proposed findings of fact and conclusions of law,' which the district courts review *de novo*." *Id*. (quoting 28 U.S.C. § 157(c)(1)).

To the extent that these consolidated matters before this Court implicate non-core claims, the parties consented to the entry of a final order by this Court resolving all of the parties' claims. [Adv. No. 20-1042, ECF Doc. 16]. Therefore, this Court has jurisdiction to grant the relief provided for herein on a final basis pursuant to 28 U.S.C. §§ 1334 and 157(c)(2). The venue of Chester J. Marine, LLC's chapter 11 case is proper under 28 U.S.C. §§ 1408 and 1409(a).

### FINDINGS OF FACT

This dispute centers on events that transpired over a few days in February 2020, resulting in Chester J. Marine, LLC ("Chester Marine") suing Russell Marine Towing, LLC ("Russell Marine") for damages in state court for non-payment for two tows it performed. [Adv. No. 20-1048, ECF Doc. 1]. Chester Marine also placed liens on Russell Marine's customers' barges. *See* Hr'g Tr. at Min. 10:44; Chester Ex. 10. Russell Marine then sued Chester Marine in federal court for damages, asserting one count for breach of contract and seeking damages associated with the two tows. [Adv. No. 20-1042, ECF Doc. 1]. Russell Marine also placed a lien on Chester Marine's tugboat and sole asset, the M/V CECILE A. FITCH (the "Tug"). *See* Hr'g Tr. at Min. 10:37; Chester Ex. 12.

**A.     Chester J. Marine, LLC**

Chester Marine is a towing company run by its principal, Larry Fitch. *See* Hr'g Tr. at Min. 9:18. The company has been operating for 35 to 40 years. *Id*. Russell Marine was the first barge broker Chester Marine worked with. *Id*. Fitch serves as a Captain of the Tug. *See* Hr'g Tr. at Min. 9:22; 9:28. Ranny Fitch, Jr., Fitch's nephew, also works for Chester Marine as the second Captain of the Tug. *See* Hr'g Tr. at Min. 9:22; 14:48. Jack Marie, a mechanic, services Chester

4

Marine's Tug, but had served himself as a tugboat captain since 1996. *See* Hr'g at 15:09–:10. Marie has extensive experience working as a mechanic for several companies for over 50 years, and is not a full-time employee of Chester Marine. *See* Hr'g Tr. at Min. 15:01; 15:30.

**B.     Russell Marine Towing, LLC**

Russell Marine is a broker that finds tugboats to tow barges for barge companies. *See* Hr'g Tr. at Min. 13:04. Russell Marine is run by its principal, Russell Lawtum, and has been in business for three years. *Id.* Prior to opening his own company, Lawtum worked for large barge companies for several years. *Id.*

**C.     Russell Marine Engaged Chester Marine To Move Barges Along the Navigable Waters of Louisiana and Texas**

On or before February 17, 2020, Russell Marine engaged Chester Marine to perform maritime towing services wherein Chester Marine would use its Tug to pick up barges at locations in Louisiana and Texas along the Gulf Intercoastal Waterway and tow them on and through the navigable waters of Louisiana and Texas. *See* Russell Ex. A; Hr'g Tr. at Min. 14:02; [ECF Doc. 24, § VII.6]. The parties did not execute a written contract. Hr'g Tr. at Min 9:18. The terms of the oral agreement between them contemplated that Russell Marine would pay Chester Marine per the number of barges towed and Chester Marine would receive payment within 45 days of completing a tow. *See* Russell Ex. A; Hr'g Tr. at Min. 9:18. The entire relationship between Russell Marine and Chester Marine was short-lived, however, lasting only two tows.

**D.     The First Tow**

The first tow commencing February 17, 2020, required Chester Marine to tow several barges, including a barge identified as "Barge SCF 16109 B." Hr'g Tr. at Min. 9:22. While in transit and waiting its turn at the Algiers Lock, it was discovered that Barge SCF 16109 B was taking on water through a hole in its wing tank. *See* Hr'g Tr. at Min. 9:23–:26. The damage

5

occurred because Barge SCF 16109 B was too heavy and was "hitting bottom" for forty miles. *See* Hr'g Tr. at Min. 9:23–:26; 13:45; 14:34; 14:49. Fitch confirmed that Barge SCF 16109 B was in Chester Marine's custody and control at the time of the damages. *See* Hr'g Tr. at Min. 11:35. Fitch also testified that overloaded barges were a common occurrence and he towed them anyway "in the ordinary course of business." *See* Hr'g Tr. at Min. 9:29.

### E. The Second Tow

The Court observes that this is not a case involving voluminous, contemporaneously exchanged documents, e-mails, or texts and every witness—save Chester Marine's contracted mechanic, Jack Marie—has a personal financial stake in the outcome of this dispute. Marie also has no familial relationship with anyone associated with Chester Marine or Russell Marine. The Court listened to the testimony and found Marie to be a compelling credible witness, and affords considerable weight to his testimony. Likewise, even accounting for their personal and financial motivations in testifying, the Court finds Fitch and Ranny Fitch to be earnest witnesses and affords weight to the testimony of each regarding the events surrounding the Second Tow.

On February 25, 2020, Fitch and the Tug picked up six of Russell Marine's barges and headed to various locations in Louisiana and Texas. *See* Hr'g Tr. at Min. 14:02–:03. Around 9:30 A.M. on February 27, 2020, Fitch stopped the Tug near Morgan City, Louisiana to complete a crew change and called Lawtum to inform him that they had stopped. *See* Hr'g Tr. at Min. 9:36; 14:05. While stopped, a crewman incorrectly filled the fuel in one of the engines, causing it to become airlocked. *See* Hr'g at Tr. 9:40–:44. Chester Marine's mechanic, Jack Marie, fixed the airlock issue, but the repair required Marie to restart the engine. Marie then discovered that the starter was not working. *See* Hr'g Tr. at Min. 9:37–:44. Regulations prohibited the Tug from

6

operating with only one working engine in the waters near Morgan City, so Marie had to fix the starter to continue. *Id.*

Fitch, Marie, and Ranny Fitch testified that Fitch called Lawtum around noon to let him know that the starter had to be replaced in order to complete the tow. *See* Hr'g Tr. at Min. 9:39–:56; 14:57–:58; 15:00–:35. All three witnesses, who were in the pilot house and listened to the call via speakerphone, heard the substance of the phone call and testified that Lawtum "clearly and definitively" fired Chester Marine after hearing about the starter and stated he would not pay Chester Marine. *See* Hr'g Tr. at Min. 9:39–:56; 14:57–:58; 15:00–:35. Fitch, Marie, and Ranny Fitch all testified that the starter had been replaced within three to four hours, but Fitch did not continue the tow because Lawtum had fired Chester Marine. *See* Hr'g Tr. at Min. 11:24; 15:02–:03; 15:36–:37. Ranny Fitch testified that, because Lawtum had fired Chester Marine, he began looking for another job, and the only job he could secure for the Tug was a job hauling rocks, which was not as lucrative as the tow job with Russell Marine. *See* Hr'g Tr. at Min. 15:06–:09.

On the morning of February 28, 2020, Loey Lawtum, Lawtum's wife and a full-time employee of Russell Marine, but not a principal or agent of Russell Marine, called Fitch and asked if he would continue the tow. *See* Hr'g Tr. at Min. 10:22–:23; 11:13; 13:11; 13:32. Mrs. Lawtum testified that Fitch agreed to tow the barges to DeValls, Louisiana, if he were paid within 15 days of completing the tow. *See* Hr'g Tr. at Min. 13:11. She sent an e-mail following that conversation and included the terms of a promissory note, which was drafted in cooperation with Ed Canton, Jr., Chester Marine's Finance Manager. Russell Ex. T; Chester Ex. 21. Canton testified that he drafted the promissory note on February 28 with the intention of recouping costs after the Tug was fired. *See* Hr'g Tr. at Min. 11:40; 11:43–:46. Fitch, however, thought that the conversation with Mrs. Lawton represented only negotiations and that Mrs. Lawtum and he would talk more once

7

she sent the promissory note. *See* Hr'g Tr. at Min. 11:13. By 4:30 P.M., Mrs. Lawtum sent a promissory note affixed with her signature. *See* Hr'g Tr. at Min. 13:18; Chester Ex. 21. Mrs. Lawtum immediately called Fitch to see if he received the promissory note and he informed her that he had accepted another job and could not take the barges to DeValls. *See* Hr'g Tr. at Min. 13:18. Additionally, he told Mrs. Lawtum he was apprehensive to work with Lawtum after being fired. *Id.* Once Fitch declined Mrs. Lawtum's request to continue the job on the evening of February 28, 2020, Lawtum e-mailed Fitch, threatening that if he left the barges "and something happens, you're in for it." Hr'g Tr. at Min. 14:11; Chester Ex. 9.

All three witnesses heard Lawtum instruct Fitch not to tow the barges further, as Lawtum said he would send another tugboat to tow Russell Marine's barges. *See* Hr'g Tr. at Min. 14:57–15:00. Based on Lawtum's instructions, the Tug and its crew stayed with the barges for approximately 72 hours. *See* Hr'g Tr. at Min. 10:30–31. Fitch also decided to stay with the barges because he wanted to maintain his business relationship with Marquette and SCF Marine, the companies that owned the barges. *See* Hr'g Tr. at Min. 9:54–56. On March 1, 2020, Fitch deduced that Lawtum was not sending another tugboat, so Fitch inspected the barges, sent a report and survey to the Coast Guard, secured the barges, and left the barges in good condition. *See* Hr'g Tr. at Min. 10:30; 11:03–:06; Chester Exs. 13 & 14.

After departing 72 hours after the initial stop, the Tug and its crew then went on to do the rock job at a day rate of $2,400. *See* Hr'g Tr. at Min. 9:58–10:00.[3]

---

[3] Lawtum testified that the phone call firing Chester Marine never occurred and that he spoke with Fitch only at 9:30 A.M. when the crew change occurred and not again until 5:30 P.M. *See* Hr'g Tr. at Min. 14:06–14:59. Lawtum contends that he called Fitch at 5:30 P.M. because GPS tracking revealed that the Tug was not moving—and that is when he learned of the issue with the starter. *See* Hr'g Tr. at Min. 14:06–:24. But Lawtum also testified that he started looking for another boat to move his barges "almost right away" because he predicted there would be an issue based on the 9:30 A.M. phone call with Fitch. *See* Hr'g Tr. at Min. 14:22.

## CONCLUSIONS OF LAW

**A.     Choice of Law**

"When a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation." *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23 (2004) (citing *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961)).

   *1.     The agreements between the parties are maritime contracts.*

To determine whether a contract is a maritime one, "the answer depends upon . . . the nature and character of the contract, and the true criterion is whether it has reference to maritime service or maritime transactions." *Id.* at 24 (internal quotations and citation omitted). Thus, a court should focus its inquiry on whether maritime commerce is the principal objective of the contract. *Id.* at 24–25. It is long held "[t]hat a contract to tow another vessel is a maritime contract is too clear for argument." *Knapp, Stout & Co. Company v. McCaffrey*, 177 U.S. 638, 643 (1900); *see also Kossick v. United Fruit Co.*, 365 U.S. at 735 ("Without doubt a contract for hire either of a ship or of the sailors and officers to man her is within the admiralty jurisdiction.").

---

Once Fitch declined Mrs. Lawtum's offer to continue the job on the evening of February 28, 2020, Lawtum sent intimidating emails to Fitch. *See* Hr'g Tr. at Min. 14:11; Chester Ex. 9. Lawtum contends that at that point, Chester Marine breached the towing agreement and assumed that Fitch could not continue the tow on February 28, 2020, because of the faulty starter. *See* Hr'g Tr. at Min. 14:08–14:15. Lawtum also theorized that Fitch invented the starter issue to hold the barges "hostage" so Chester Marine could be paid sooner. *See* Hr'g Tr. at Min. 14:09–14:15. On February 29, 2020, Lawtum sent additional threatening e-mails to Fitch, stating that he "better not leave the barges" and that a boat was on the way. *See* Chester Ex. 9.

Based on the demeanor of the witness and significant inconsistencies in his testimony, the Court declines to find Lawtum to be a credible witness and finds the description of events as told by Fitch, Ranny Fitch, and Marie to be more credible than as told by representatives of Russell Marine.

The two contracts at the heart of the dispute between the parties here are maritime contracts,[4] as maritime commerce is their principal objective: Russell Marine engaged Chester Marine to tow barges along the navigable waters of Louisiana and Texas by oral agreement.[5]

2. *The dispute is not inherently local.*

The second step of the analysis to determine whether federal maritime law controls this dispute requires this Court to ask whether each of these maritime contracts is "nevertheless of such a 'local' nature that its validity should be judged by state law?" *Kossick*, 365 U.S. at 735. The parties here have articulated no specific Louisiana interest at stake; indeed, even if there were overlapping state interests, if they "cannot be accommodated without defeating a federal interest . . . then federal substantive law should govern." *Kirby*, 543 U.S. at 27; *cf. Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 313 (1955) (applying state law to maritime contract for marine insurance because of state regulatory power over insurance industry). When determining if a contractual dispute is inherently local, the main consideration is to maintain the uniform meaning of maritime contracts. *Kirby*, 543 U.S. at 28.

---

[4] As a point of clarity, the valid maritime contracts here are the oral towing agreements made between the parties on or before February 17, 2020, as to Tow 1, and made between the parties on or before February 25, 2020, as to Tow 2. Despite not pleading a breach-of-contract claim for breach of a promissory note in its Complaint, at trial Russell Marine introduced evidence of a promissory note purported to represent a third maritime contract between Mrs. Lawton on behalf of Russell Marine and Fitch on behalf of Chester Marine. *See* Hr'g Tr. at Min. 13:15. But the evidence showed that the proposed promissory note was never agreed to and, therefore, is not a valid contract. Although maritime law recognizes oral contracts as valid, "[i]t is well settled that a plaintiff suing on a contract, whether written or oral, is required to establish the basic elements of a contract, i.e., offer, acceptance, and consideration." *Tasch, Inc. v. Diamond Offshore Drilling, Inc. (In re Tasch, Inc.)*, No. 01-31363, at *3 (5th Cir. July 31, 2002) (citations omitted). The Court finds that Fitch negotiated with Mrs. Lawtum regarding her offer concerning the completion of Tow 2 after Lawtum fired Chester Marine, but Fitch did not accept her offer. Fitch's intent not to enter into any new agreement was made clear by his unwillingness to sign the promissory note, his clear communication of his intent not to complete Tow 2 or work with Lawtum further, and the fact that he accepted another towing job on behalf of Chester Marine. Further, no evidence was offered indicating that Mrs. Lawton even had the authority to bind Russell Marine. *See* Hr'g at Min. 13:04–:58.

[5] "For it is an established rule of ancient respectability that oral contracts are generally regarded as valid by maritime law." *Kossick v. United Fruit Co.*, 365 U.S. 731, 734 (1961).

The dispute before this Court is not inherently local because there is not a state interest that overrides the necessity for uniformity in interpreting federal maritime contracts. None of the arguments raised by parties involves laws unique to Louisiana law, so Louisiana law does not need to supplement the analysis. Therefore, federal maritime contract law is the correct choice of law because the dispute involves maritime contracts and is not inherently local.

### B. Russell Marine Breached the Maritime Contracts

Chester Marine and Russell Marine each accuse the other of breaching the maritime towing contracts. "To establish breach of a maritime contract, a plaintiff must demonstrate '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" *W. Towboat Co. v. Vigor Marine, LLC*, No. 20-0416, 2021 WL 2531009, at *8 (W.D. Wash. June 21, 2021) (quoting *Eternity Global Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)). "The law is settled in admiralty actions that plaintiffs must prove their claims by a preponderance of the evidence, whether direct or circumstantial." *Witco Chem. Corp. v. M/V Miss Carolyn*, 426 F. Supp. 373, 375 (W.D. La. 1977).

#### 1. Russell Marine breached the First Tow agreement

The agreements made on or before February 17, 2020, as to the First Tow, is a valid maritime contract. The parties do not dispute the fact that Chester Marine completed the First Tow. But Chester Marine has satisfied its burden to show that Russell Marine has not paid Chester Marine for the First Tow. *See* Hr'g Tr. at Min. 10:22. Chester Marine's invoice for the First Tow is $35,909.01. *See* Chester Ex. 4. Here, Russell Marine breached the maritime contract for the First Tow by failing to pay the amount due under the contract. *See, e.g., OOCL (USA) Inc. v. Transco Shipping Corp.*, No. 13-CV-5418, 2015 WL 9460565, at *6 (S.D.N.Y. Dec. 23, 2015)

(finding a breach of bills of lading by failing to pay demurrage and detention fees for unclaimed cargo); *Dapex, Inc. v. Omaya for Importing Cars*, No. 14-1792, 2015 WL 3505404, at *4 (D.N.J. 2015) (finding a breach of contract for failure to pay for transport of used cars).

### 2. Damages owed for breach of the First Tow agreement

The relief sought in an action in admiralty for breach of a maritime contract typically includes compensatory monetary damages. *See Freeport Sulphur Co. v. S/S Hermosa*, 526 F.2d 300, 304 (5th Cir.1976); *Dapex, Inc.,* 2015 WL 3505404, at *4; *Crowley P.R. Servs., Inc. v. Cervezas Del Sur, Inc.*, No. 14-422, 2014 WL 6704594, at *4 (M.D. Fla. 2014).[6] "The purpose of compensatory damages . . . is to place the injured person as nearly as possible in the position he would occupied if the wrong had not occurred." *Freeport Sulphur Co.*, 526 F.2d at 304; *see also In re ENSCO Offshore Co.*, 990 F. Supp. 2d 751, 757 (S.D. Tex. 2014). The amount owed on the invoice for the First Tow is $35,909.01, which represents proper compensatory damages for the breach.

But when a barge is in the sole custody and control of a charter party, for example, the charter party is responsible for the resulting damage. *See Galveston Cty. Nav. Dist. No. 1 v. Hopson Towing Co.*, 92 F.3d 353, 355 (5th Cir. 1996); *Cities Serv. Ref. Corp. v. Nat'l Bulk Carriers, Inc.*, 146 F. Supp. 418, 420 (S.D. Tex. 1956) (finding that a charter party having sole custody and control of a barge was negligent for "permitting the manhole to remain open on a low-lying barge" with an overloaded stern). Courts also consider whether adequate notice was given of the issue to the charterer to determine the charter party's liability for the damages that occur within its custody and control. *See Hopson Towing Co.*, 92 F.3d at 355. The duty to exercise

---

[6] This portion of the Opinion relies on case law from both maritime charter contract and tort cases because both follow analogous general maritime law principles regarding damages.

reasonable care and maritime skill, however, "is not lessened by the fact that the vessel was unseaworthy at the beginning of the voyage" and "when the tower is placed on notice of this unseaworthy condition," it is "the tug's duty is to exercise reasonable care to safeguard the tow until the towing service is performed or performance is excused." *Gulf Wave Towing Co. v. Mitchell*, 176 F. Supp. 636, 640 (E.D. La. 1959).

Russell Marine breached the agreement by not paying Chester Marine for its performance on the First Tow. But that amount must be offset by the damages that occurred to Barge SCF 16109 B while in the custody and control of Chester Marine. Russell Marine paid $15,000 for the repairs to the barge, so the total amount of damages owed by Russell Marine to Chester Marine for the First Tow after that offset is **$20,909.01**.

### 3. Russell Marine breached the Second Tow agreement

The agreements made on or before February 27, 2020, as to the Second Tow, is a valid maritime contract. Russell Marine asserts that Chester Marine breached the Second Tow agreement when it failed to complete the tow due either to mechanical problems or plain greed. *See* Hr'g Tr. at Min. 14:09–:15. But "maritime and contract law recognizes that parties can waive breach of contract claims." *Natures Way Marine, LLC v. Everclear of Ohio, Ltd.*, 37 F. Supp. 3d 1232, 1242 (S.D. Ala. 2014) (citing *U.S. Gypsum Transp. Co. v. Dampskibs Aktieselskabet Karmoy*, 48 F.2d 376, 378 (E.D.N.Y. 1930)). "Waiver is the intentional relinquishment of a known right, and a party's intent to waive a right can be drawn from conduct that is inconsistent with the assertion of that right." *Id*. (citations omitted). For example, "[a]n 'anticipatory breach' of a contract is one committed before the time when there is a present duty of performance and results from words or conduct indicating an intention to refuse performance in the future." *F.W.F., Inc. v. Detroit Diesel Corp*., 494 F. Supp. 2d 1342, 1360 (S.D. Fla. 2007) (citation omitted). "It consists

of an outright refusal by a party to perform a contract or its conditions, or at least of some manifestation by one party to the other that the first cannot or will not perform some of its obligations under the contract." *Id.* (citation omitted). An anticipatory repudiation is itself a breach of contract. *See id.* (citation omitted); .

Here, the evidence shows that, although Chester Marine's Tug experienced mechanical problems, Fitch and his crew did not abandon or repudiate the Second Tow agreement. *See* Hr'g Tr. at Min. 9:39–:56; 14:57–:58; 15:00–:35. He made every effort to keep Lawtum informed of the status of the Tug's mechanical difficulties and repairs. *See* Hr'g Tr. at Min. 9:39–:56; 14:57–:58; 15:00–:35. And the evidence shows that Fitch and his crew repaired the engine and replaced the starter in order to complete the Second Tow. *See* Hr'g Tr. at Min. 11:24; 15:02–:03; 15:36–:37. But Lawtum interrupted Chester Marine's performance and instructed Fitch and his crew not to proceed further. *See* Hr'g Tr. at Min. 9:39–:56; 14:57–:58; 15:00–:35; *cf. Sanders v. Meyerstein*, 124 F. Supp. 77, 83 (E.D.N.C. 1954). Indeed, Lawtum fired Fitch and his crew, told them they would not get paid for the tow, and instructed them to wait with the barges while Lawtum arranged for their replacement. *See* Hr'g Tr. at Min. 9:39–:56; 10:22; 10:30–:31; 14:57–:58; 15:00–:35. He later threatened Fitch and his crew with litigation. *See* Chester Ex. 9.

"Unless time is of the essence of the contract, delay in performance is not considered a material breach justifying recission." *Sanders*, 124 F. Supp. at 83; *see also United States v. M/V Marilena P*, 433 F.2d 164, 169 (4th Cir. 1969). Nothing at trial demonstrated to the Court that Chester Marine's Tug would be unable to complete the Second Tow timely, such that Russell Marine's recission or repudiation would have been justified. "[R]epudiation by a charterer is permissible only where the breach of the owner's undertaking . . . is so substantial as to defeat or frustrate the commercial purpose of the charter." *Aaby v. States Marine Corp.*, 181 F.2d 383, 386

(2d Cir. 1950). Because Lawtum had no legal right to treat the contract as terminated, his anticipatory repudiation of the Second Tow agreement constitutes a breach of that agreement, leaving Russell Marine liable to Chester Marine for damages. *See Sanders*, 124 F. Supp. at 83. The Court further concludes that Russell Marine waived its breach-of-contract claim through its repudiation of the Second Tow agreement.

Withdrawal after the termination or repudiation of a contract is a valid response and is not considered breach. *See Ocean Cargo Lines, Ltd. v. N. Atl. Marine Co.*, 227 F. Supp. 872, 881 (S.D.N.Y. 1964); *Commercial Metals Co. v. Int'l Union Marine Corp.*, 294 F. Supp. 570, 574 (S.D.N.Y. 1968) (finding that, after repudiation, "[i]t is no longer necessary for the plaintiff to perform or to tender performance"). As soon as Lawtum unjustifiably repudiated the Second Tow agreement by firing the Tug, Chester Marine had the right to withdraw from the agreement with Russell Marine and was no longer required to perform under the agreement.

    4.  *Damages for breach of the Second Tow agreement*

"[W]hen one party to a contract repudiates that contract, the other party 'is entitled to restitution for any benefit that he has conferred on' the repudiating party 'by way of part performance or reliance.'" *Mobil Oil Exploration & Producing Se., Inc. v. United States*, 530 U.S. 604, 608 (2000) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 373 (1979) [hereinafter *Restatement*]). "The Restatement explains that 'repudiation' is a 'statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages of total breach." *Id*. (quoting *Restatement*, § 250). "And 'total breach' is a breach that 'so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance." *Id*. (quoting *Restatement*, § 243). In other words: "A

repudiation or other total breach by one party enables the other to get a judgment for damages or for restitution without performing acts that would otherwise have been conditions precedent. It is no longer necessary for the plaintiff to perform or to tender performance." *Commercial Metals Co.*, 294 F. Supp. at 574 (citation omitted).

Russell Marine has not paid Chester Marine for the Second Tow. Chester Marine's invoice admitted as evidence shows that a balance of $29,616 is owed for partial performance of the Second Tow. Chester Ex. 5. Chester Marine also claims damages for lost profits because of Russell Marine's repudiation and $36,000 in standby fees. Based on following discussion, the Court awards $36,000 in standby fees but no damages for lost profits.

"Consequential, or 'special' damages, which are those unusual or indirect costs that, although caused by the defendant's conduct in a literal sense, are beyond what one would reasonably expect to be the ordinary consequences of a breach." *Tex. A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 404 (5th Cir. 2003) (citations omitted). "As a general rule, special damages are not recoverable in an action for breach of contract." *Id*. "Instead, to recover special damages, a plaintiff must establish that the defendant had notice of the special circumstances from which such damages would flow." *Id*. (internal quotations and citations omitted).

Under general maritime law, "[l]oss of profit may be awarded as long as it is proved with reasonable certainty," and the burden to show lost profits is on the wronged vessel owner. *Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc.*, 747 F.2d 995, 1001 (5th Cir. 1984); *see also In re ENSCO Offshore Co.*, 990 F. Supp. 2d 751, 761 (S.D. Tex. 2014); *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 379 (5th Cir. 2000). In commercial cases, the wronged party must show that the vessel "has been engaged, or was capable of being engaged in a profitable commerce." *In re*

*ENSCO Offshore Co.*, 990 F. Supp. 2d at 762 (citations omitted). "[T]he time honored rule in maritime cases [is] that a proper method of determining lost . . . profits is to seek a fair average based on a number of voyages before and after" the wrong occurred. *Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc.*, 747 F.2d at 1001. For example in *Comar Marine, Corp. v. Raider Marine Logistics, L.L.C.*, the Fifth Circuit affirmed a district court's denial of an award for lost profits when vessel owners failed to demonstrate lost profits due to wrongful arrest of vessels with reasonable certainty because they failed to provide "any indication of when all of the vessels were put back to work, the frequency of the work, or the profits from that work." 792 F.3d 564, 577 (5th Cir. 2015). On the other hand, the Fifth Circuit affirmed an award of lost profits when the vessel owner was able to show "that the barge would have continuously hauled [product] from Louisiana to Illinois, that the . . . fleet was being used at full capacity, and that the historical profitability of the barge was $502/day." *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 379 (5th Cir. 2000).

Here, Chester Marine did not satisfy its evidentiary burden to obtain an award of lost profits. It presented no evidence indicating a "reasonable certainty" that its sole asset would have been able to work or earn profits had it not been arrested by Russell Marine. But as to the $36,000 in stand-by fees, even if those are not a foreseeable consequence of Russell Marine's repudiation of the Second Tow agreement, Lawtum certainly had notice of the "special circumstances from which such damages would flow" as he told Fitch and his team to remain with the barges while he found a replacement tugboat to complete the Second Tow. *See* Hr'g Tr. at Min. 10:30–31. Thus, for the Second Tow, the Court finds that Russell Marine is liable to Chester Marine for the amount of **$65,616**, representing the amount of the invoice for partial performance and stand-by fees.

5.  *Maritime liens, attorneys' fees and costs, and prejudgment interest*

A maritime lien is a form of recovery that parties may use in the event that a maritime contract is breached. *Int'l Marine Towing, Inc. v. S. Leasing Partners, Ltd.*, 722 F.2d 126, 131 (5th Cir. 1983) ("Because the damages sought to be recovered by [the charterer] . . . flow directly from the breach of the charter, it has a maritime lien."). Because this Court has determined that Chester Marine did not breach either tow agreement, Russell Marine's maritime lien currently attached to the Tug should be discharged. Additionally, Chester Marine's lien on Russell Marine's barges or its customers' barges, if still attached, should be discharged once awarded damages are received.

Attorneys' fees and costs are typically only recoverable under a breach of maritime contract if the charterer acted in bad faith. *See Seguros Banvenez, S.A. v. S/S Oliver Drescher,* 761 F.2d 855, 861 (2d Cir. 1985); *see also Demsey & Assocs. v. S.S. Sea Star,* 500 F.2d 409, 411 (2d Cir. 1974) ("[I]n the absence of statute or contractual authorization, attorney's fees are not generally recoverable."). Although Chester Marine requests attorneys' fees and costs, the record does not reveal that Russell Marine acted in bad faith, so both parties will bear their own attorneys' fees and costs.

Finally, "[u]nder maritime law, the awarding of prejudgment interest is the rule rather than the exception, and, in practice, is well-nigh automatic." *Deloach Marine Servs., L.L.C. v. Marquette Transp. Co., L.L.C.*, 974 F.3d 601, 610 (5th Cir. 2020) (citation omitted). "[A] trial court has the discretion to deny prejudgment interest only where peculiar circumstances would make such an award inequitable." *Id.* (citation omitted). "Peculiar circumstances may be found where plaintiff improperly delayed resolution of the action, where a genuine dispute over a good faith claim exists in a mutual fault setting, where some equitable doctrine cautions against the

award, or where the damages award was substantially less than the amount claim by plaintiff." *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1028. (5th Cir. 1986). In the Fifth Circuit, "prejudgment interest is usually awarded from the date of loss." *Id*.

In setting the rate of prejudgment interest as to past damages, the Court "may look to the judgment creditor's actual cost of borrowing money, to state law, or to other reasonable guideposts indicating a fair level of compensation," including 28 U.S.C. § 1961. *Offshore Marine Contractors, Inc. v. Palm Energy Offshore, L.L.C.*, 779 F.3d 345, 351 (5th Cir. 2015); *see also Reeled Tubing, Inc.,* 794 F.2d at 1029. Louisiana's judicial interest rate is currently set at 5.75% per year. *See ING Bank, N.V. v. M/V Charana Naree*, 446 F. Supp. 3d 163, 177 (W.D. La. 2020) (citing LA. REV. STAT. § 13:4202(B)(1)). A recent admiralty case before the United States District Court for the Eastern District of Louisiana, however, determined that 1% rate per year was appropriate. *Kiwia v. M/V Oslo Bulk 9*, No. 20-96, 2021 WL 2155081, at *10 (E.D. La. May 24, 2021).

Both parties requested prejudgment interest. The Court awards prejudgment interest of 1% on Russell Marine's **$15,000** offset damages owed for repairs, calculated from when the damage occurred on February 20, 2020. *See* Russell Ex. N. The Court also awards prejudgment interest of 1% on Chester Marine's damages award totaling **$20,909.01** from the date of breach for non-payment of the invoice for the First Tow, or April 8, 2020; and the Court awards prejudgment interest of 1% on Chester Marine's damages award totaling **$65,616** from the date of breach of the Section Tow agreement, or February 27, 2021.

## CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the claim for breach of contract asserted in Russell Marine Towing, LLC's Complaint is **GRANTED IN PART** and **DENIED IN PART** and Russell Marine Towing, LLC is entitled to an offset of $15,000.00, plus prejudgment interest as described herein against its liability to Chester J. Marine, LLC**;**

**IT IS FURTHER ORDERED** that the claims alleged in Chester J. Marine, LLC's Complaint are **GRANTED IN PART** and **DENIED IN PART**, and Chester J. Marine, LLC is entitled to judgment against Russell Marine Towing, LLC on its claims in the amount of $86,525.01, plus prejudgment interest as described herein;

**IT IS FURTHER ORDERED** that the Objection to Proof of Claim No. 2 is **SUSTAINED IN PART** and **OVERRULED IN PART;** Russell Marine Towing, LLC's Proof of Claim No. 2 is allowed in the amount of $15,000 in the form of a setoff against its liability to Chester J. Marine, LLC;

**IT IS FURTHER ORDERED** that all requests for attorneys' fees and costs are **DENIED**;

A separate judgment on the Complaint filed in the consolidated, above-captioned Adversary Proceedings consistent with this Memorandum Opinion and Order will be entered in accordance with Bankruptcy Rules 7054 and 9021.

New Orleans, Louisiana, October 13, 2021.

MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE